IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

VINCENT BOOKER,                                CIVIL DIVISION

          Plaintiff,                       Case No. 2:25-cv-01388

      v.

WEDRIVEU, INC.,

          Defendant.

## COMPLAINT AND JURY DEMAND

A.    ***Preliminary Statement***

1.    The plaintiff Vincent Booker brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* to redress violations of his right to be free from employment discrimination based upon his race.  Because of the violations described herein, this Court is also empowered to exercise pendant jurisdiction pursuant to the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.* when those claims are raised via an amended complaint upon their maturation on June 2, 2026.  A jury trial is demanded.

B.    ***Jurisdiction***

2.    The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 2000e *et seq.*, 28 U.S.C. § 1331 and under the doctrine of pendant jurisdiction (when the state law claims mature on March 28, 2025).

3.    On or about June 2, 2025, the plaintiff filed a timely charge alleging discrimination with the Equal Employment Opportunity Commission ("EEOC"), docketed at 533-202-02283.  This charge was simultaneously cross-filed with the Pennsylvania Human Relations Commission.

4.    The EEOC issued a Notice of Right to Sue dated August 12, 2025.

5.      This Complaint is filed within 90 days of receipt by the plaintiff of the Notice of Right to Sue.

C.      ***The parties***

6.      The plaintiff (African American) is an adult individual who, at all times material, resided in White Oak, PA (Allegheny County).

7.      The defendant WeDriveU, Inc. ("WDU") is an entity doing business in the Commonwealth of Pennsylvania, and, specifically, in this district.

8.      At all times material, the defendant employed more than fifteen employees.

9.      The defendant was the plaintiff's employer and is an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(b).

D.      ***Factual Background***

10.      The plaintiff (African American) was employed WDU from May 17, 2023 through April 7, 2025.

11.      WDU is a transportation company that provides shuttle and transit transportation for public transits, corporate shuttles, university shuttles, and hospital shuttles.

12.      The plaintiff was employed as a recruiter.  His duties included the full cycle of recruiting drivers. mechanics, route supervisors and dispatchers for the company, such as setting up and making job posts, creating the interview schedule, sending contingent offer letters, sending and monitoring the applicant's background check, drug and physical screening and scheduling and conducting job fairs.

13.      The plaintiff performed all the functions of his job in an exemplary fashion and was an excellent employee.  Throughout his employment, he was consistently praised for his dedication to the job, work ethic and the results that he achieved.

14. The majority of the exempt and non-exempt recruiters were Caucasian; the plaintiff was one of very few African Americans in a recruiting position.

15. At all times relevant:

(a) Mary Ann Egan (Caucasian) was a Senior Manager, Talent Acquisition.

(b) Justin Thulien (Caucasian) was the Chief People Officer.

(c) Yuri Sanz (Hispanic) was a Senior Director.

(d) Naomi Dugan (Caucasian) was in HR.

(e) Shaun Grey (Caucasian) was a Transit General Manager.

(f) Stephanie Loving (Caucasian) was Onboarding Manager.

(g) Alonda Burkley (African American) was a non-exempt senior recruiter.

(h) Katrina Delgadillo (Filipino) was a non-exempt recruiter.

(i) Melissa Gilfory (Caucasian) was a non-exempt recruiter.

(j) Mandi Mwangi (Caucasian) was an onboarder.

16. During the 2024 third quarter town hall conference held on Google Meet, a question was submitted to Thulien about the lack of minorities in WDU's management. This question was not addressed or answered during the town hall meeting.

17. In late 2024, WDU created an "Onboarding Team," which was focused on integrating new hires into the company culture and accelerating their productivity. Some of the functions that had been previously performed by recruiters were assigned to the Onboarding Team. This change allowed the recruiters to concentrate their efforts on finding and attracting talent and, after suitable candidates were identified, the Onboarding Team took care of the hiring process.

18.    Although the plaintiff was a recruiter, he was asked to perform onboarding functions because onboarders, including Mwangi, were overwhelmed and needed help.  The plaintiff happily did so.

19.    In 2024, the plaintiff scheduled and conducted several successful job fairs.  The plaintiff received praise from upper management for the number of applicants who attended and the number of contingent offers that were extended.

20.    The plaintiff received a review in January 2025.  He was given a pay increase because of his excellent performance.

21.    In 2025, Gilfory requested the plaintiff to help her with virtual job fairs.  Again, the plaintiff did so.

22.    Starting in early 2025, WDU found that the number of open positions for the WMATA locations, (Capitol Heights MD, Hubbert Rd Landover, MD and Springfield, VA) was larger than predicated.  The plaintiff worked with upper management to formulate a plan to meet that demand.  The plan included increasing the visualization of the open jobs and the availability of interview slots.  Over the course of several weeks, the plan attracted applicants and many were hired, but it was not enough to offset the number of drivers who were leaving the company and the number of routes that needed to be filled.

23.    In earlier March 2025, the plaintiff's position was changed to Talent Acquisition Specialist.  He was provided business cards reflecting the new title.

24.    Given the need for drivers, management tasked the plaintiff to have an in-person job fair.  The job fair was set up for March 19, 2025.  Over 300 individuals attended the job fair and more than 150 individuals signed contingent offer letters and started the hiring process.

25.    This job fair was a resounding success.  Sanz told the plaintiff that "Corporate took notice of this job fair and was impressed by the results."  The plaintiff was given a pail of flavored popcorn and a note that stated:  *Vince, Thank you for the dedication and hard work put in the hiring event.  We greatly appreciate it!*  The note was signed by Sanz, Loving and Egan.

26.    In early April 2025, the plaintiff had a short one-on-one Google Meet meeting with Egan.  She asked him about his day-to-day activities.  The plaintiff responded that he "takes care of problems," talks to hiring managers, and set up interviews.  Egan mentioned a military project with which the plaintiff was involved and then went off on a tangent discussing other issues that did not involve the plaintiff.  The plaintiff felt that the call went well; however Egan seemed to be in a rush and ended the meeting quickly.  She did not ask him any further details about his day-to-day activities

27.    On April 7, 2025, the plaintiff was called into another Google Meet meeting with Egan. Dugan was also in attendance.  Egan told the plaintiff that his employment was being terminated, effective immediately.  The plaintiff was shocked; this came totally out of the blue. He asked why the decision had been made to terminate his employment.  Egan danced around the subject initially but then said that was based on her one-on-one meeting with him the week before.  The plaintiff asked what he said or what did he not say during that meeting that resulted in the decision to fire him.  She responded that he did not mention interviewing people as part of his day-to-day activities.  The plaintiff was surprised by this and told Egan that he was not tasked with interviewing applicants unless it was in person or during a virtual job fair.  He also pointed out that the Fountain program that the company used was primarily for applicant tracking and that he schedules interviews for the hiring managers.  He explained, that after the hiring manager conducts the interview, he or she tells the plaintiff whether to extend an offer.  He concluded by

asking why not doing interviews (a task that he was not supposed to perform) had been held against him.  Egan provided no answer and, instead, stated "well, at the end of this call you will no longer be a part of WeDriveU."

28.    Shortly after this meeting, the plaintiff learned that Burkley and Delgadillo were also terminated the same day.  These three individuals were all minorities.  None of the white recruiters were terminated in this purge.

29.    Two days after the plaintiff was terminated, he saw that his job was posted.  Upon information and belief, Travis Rottini, Caucasian, was hired for the position.

30.    The plaintiff filed for unemployment and was notified that WDU was contesting his claim, asserting that he had "quit" and had been offered "retirement" and had refused it.  Neither of these contentions were true.

31.    The plaintiff learned that WDU also claimed that Burkley and Delgadillo had also quit and refused their "retirement."  Again, these contentions were not true.

32.    Grey learned that the plaintiff had been terminated.  Unsolicited, he posted the following recommendation on the plaintiff's LinkedIn:

> *I had the pleasure of working with Vincent Booker during a critical growth phase for our team in Tucson with WeDriveU. Throughout the process, Vincent demonstrated a dedicated and proactive approach, consistently following up to ensure every step of our hiring needs were met. His professionalism, responsiveness, and commitment to delivering results stood out from day one. Vincent's ability to stay engaged and aligned with our goals made a significant impact on our success. Any organization would be fortunate to have Vincent as part of their team—he would be a vital asset wherever he goes.*

33.     The reason given for the plaintiff's termination was nothing more than a pretext and the real reason that he was fired was because of his race.  First, he was an excellent employee with no record of disciplinary action or negative performance issues.  Second,

interviewing applicants was never part of his job responsibilities; he was required to *schedule* interviews for the hiring managers.  Further, he was never told that he was supposed to interview applicants.  Upon information and belief, similarly situated white recruiters were not disciplined or terminated for failing to interview applicants.  Third, the other two individuals terminated on April 7, 2025 were both minorities; no white recruiters were terminated. Fourth, WDU represented to the Unemployment Office that the plaintiff had "quit" when it is undisputed that he had not done so.  Notably, WDU claimed that Burkley and Delgadillo both had quit as well when it is undisputed that they had not done so.  Finally, the plaintiff was replaced by an individual outside of his protected class.

### FIRST CAUSE OF ACTION

34.    The preceding paragraphs are incorporated herein by reference as if they were set forth at length.

35.    The plaintiff is African American and thus is protected against discrimination on the basis of his race pursuant to Title VII.

36.    The plaintiff was qualified for his position.

37.    Despite his qualifications, the plaintiff was terminated.  The reasons given for his discharge were a pretext.

38.    The defendant's discharge of the plaintiff was because of his race in violation of Title VII.

39.    The defendant's violation of Title VII was committed with intentional or reckless disregard for the plaintiff's federally protected right to work in an environment free of race discrimination.

WHEREFORE, the plaintiff respectfully requests judgment be entered in his favor and against the defendant and that the defendant be required to provide all appropriate remedies under Title VII and the PHRA (when those claims mature on June 2, 2026), including attorney's fees and costs.

Respectfully submitted,

*/s/ Michael J. Bruzzese*

Michael J. Bruzzese
Pa. I.D. No. 63306
220 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
(412) 281-8676
mjb@mjblawoffice.com

Counsel for the plaintiff

Dated: September 11, 2025